*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1680**

State of Minnesota,
Respondent,

vs.

Delonte Ahshone Thomas,
Appellant.

**Filed August 29, 2016
Affirmed
Stauber, Judge**

Hennepin County District Court
File No. 27-CR-14-20537

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda K. Jenny, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Rochelle R. Winn, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Stauber, Presiding Judge; Reyes, Judge; and John Smith, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**STAUBER**, Judge

On appeal from his conviction of multiple counts of attempted first- and second-degree murder, appellant argues that (1) the district court abused its discretion by denying his request for a one-week continuance; (2) the district court committed prejudicial error by refusing to instruct the jury on the factors it should consider in evaluating eyewitnesses' identification of appellant as the shooter; and (3) the evidence was insufficient to support his conviction of attempted second-degree intentional murder of one of the victims. We affirm.

**FACTS**

In July 2014, A.M. and her mother, S.M., hosted a birthday party for M.G. The party lasted late into the night, and appellant Delonte Ahshone Thomas arrived at the party sometime after midnight with his girlfriend, A.S., and his brother, L.T. After appellant's arrival, the whole group sang "Happy Birthday" to M.G. Appellant then asked the group to sing to A.S. since it was also her birthday. A.M. refused to sing, prompting a verbal altercation between A.M. and appellant in A.M.'s kitchen. Appellant then pulled out a black gun with an extended clip, pointed it at A.M.'s head, and pulled the trigger twice. The gun clicked without firing.

After the altercation, A.S., L.T., and appellant left the party. Approximately 20 minutes later, A.S. returned and dropped off appellant and his brother two-and-a-half blocks away from the party because, according to A.S., appellant wanted to retrieve some marijuana he left there. In the meantime, A.M. stepped outside and smoked a cigarette with Q.W. and J.G. Q.W. testified that while reaching down to put out her cigarette she

2

felt a weird feeling so she turned around. Q.W. claimed that she saw somebody crossing the alley and into some bushes, "creeping" towards them with a black gun, prompting her to yell, "[H]e's got a gun!"

A.M. testified that when she turned and looked, she saw appellant about ten feet away holding a black gun with an extended clip, and he then started shooting. A.M. tried to run, but appellant shot her, and she fell to the ground. A.M. had wounds from ten gunshots, including three shots near her ribcage and the small of her back, two in her buttocks. A.M. testified that she saw appellant run through the front gate before she lost consciousness.

Q.W. testified that after she saw appellant holding the gun, she turned around and ran, and then fell to the ground because she was shot. Q.W. testified that she was shot eight times, and her liver, lungs, and pancreas were all injured.

J.G. testified that as she ran away, she was shot in her foot and ankle and then fell down. According to J.G., someone then stood over her and shot her multiple times "higher and higher" on her left side—twice on her ankle, then just below the knee, then above the knee. She was shot a total of eight times.

At 1:27 a.m., a surveillance camera from a convenience store across the street from the shooting recorded two males running away from the shooting location. One of the males was holding something near his right hip while he was running. A.S. testified that after she heard gunshots, appellant and his brother got back into her car and denied knowing anything about the gunshots. But A.S. claimed that appellant admitted later that day that he was involved in the shooting.

3

A.M. told police that a man she knew as "Dee" shot her, and that Dee was a black male, with a fade haircut, wearing eyeglasses. Police then showed A.M. a photograph of appellant and his brother. Appellant was wearing a black shirt, brown khaki shorts, and glasses. A.M. pointed to appellant in the picture as the person who shot her and said his name was "Dee." Although A.M. admitted that she only knew appellant by his nickname and that she had not seen him since he was a young child, she stated that she has known appellant's family her whole life.

Q.W. testified that while she was in the hospital, police showed her the photo of appellant and his brother. When she viewed the photo, she drew a line to appellant and wrote, "Guy who shot me!" J.G. could not identify the shooter but testified that she thought the shooter had light skin and braids, and was named "Chico."

Appellant was charged with three counts of attempted first-degree murder and three counts of attempted second-degree intentional murder. The day before trial, the state first gave notice that it would call T.S., appellant's cellmate in jail, as a witness. Appellant moved for a one-week continuance to prepare for the new witness and pursue avenues of cross-examination. The district court denied the motion. On Friday, June 12, 2015, the second day of testimony, T.S. testified that appellant told him in jail that appellant used a .40 caliber Glock pistol with an extended clip to shoot all three women.

At the close of state's case, appellant moved for a judgment of acquittal on counts three and six—attempted first- and second-degree murder involving J.G.—alleging that the state failed to prove intent because J.G. was shot only in the leg. The district court denied the motion. The defense also requested a cautionary jury instruction concerning

4

eyewitness-identification testimony based on the defense's theory that the identification of the shooter was at issue. The district court denied the motion and did not give the instruction.

The jury found appellant guilty of one count of attempted first-degree murder of A.M. and three counts of attempted second-degree murder of A.M., Q.W., and J.G. Appellant was sentenced to 333 months in prison. This appeal follows.

## D E C I S I O N

### I.

Appellant argues that the district court abused its discretion by denying his request for a continuance. We review a district court's decision to grant or deny a motion for continuance for an abuse of discretion. *State v. Turnipseed*, 297 N.W.2d 308, 311 (Minn. 1980). On review, appellate courts look at the circumstances surrounding the continuance request and determine whether the denial was so prejudicial in the preparation of an adequate defense as to "materially affect the outcome of the trial." *State v. Sanders*, 598 N.W.2d 650, 654 (Minn. 1999) (quotations omitted).

In denying the continuance the district court found that (1) appellant made a speedy trial demand; (2) the case was "old"; (3) the nature of the evidence—T.S.'s account of what appellant told him in jail about the shooting—is the type of evidence that the defense could respond to without adding a significant amount of preparation time; and (4) the state would call T.S. as a witness later in the trial and a transcript of T.S.'s interview with police would be provided to the defense.

Appellant argues that by denying his request for a continuance, he was denied a fair trial because he lacked adequate time to prepare for trial. We disagree. Appellant had requested a continuance until Monday, June 15, 2015, to adequately prepare for T.S. as a witness. But, although appellant was given late notice of the state's intent to call T.S., the district court ensured that T.S. would be called later in the trial. In fact, T.S. did not testify until Friday, June 12, 2015, only a few days before appellant's requested continuance date. Thus, appellant had time to determine avenues of cross-examination and trial strategy. Moreover, appellant's counsel effectively cross-examined T.S. on the plea-deal he received for testifying against appellant and effectively discredited T.S. by showing that appellant's legal papers were readily accessible to T.S. in jail and provided him the opportunity to learn specific details of the case. Therefore, based on the circumstances presented, we conclude that the district court did not abuse its discretion by denying appellant's request for a continuance.

## II.

A district court has "considerable latitude" in the selection of language for jury instructions. *State v. Gatson*, 801 N.W.2d 134, 147 (Minn. 2011) (quotation omitted). "The refusal to give a requested jury instruction lies within the discretion of the district court and no error results if no abuse of discretion is shown." *State v. Hensel*, 874 N.W.2d 245, 255 (Minn. App. 2016) (quotation omitted). A defendant is entitled to a jury instruction on his or her theory of the case if there is evidence to support it, but the court need not give the requested instruction if the substance of the request is contained in the court's charge. *State v. Blasus*, 445 N.W.2d 535, 542 (Minn. 1989).

6

Appellant argues that the district court abused its discretion by not giving the standard jury instruction on eyewitness identification testimony contained in CRIMJIG 3.19. *See* 10 *Minnesota Practice*, CRIMJIG 3.19 (2012). We disagree. Whether CRIMJIG 3.19 should be given as a cautionary instruction depends on the circumstances of the case. *State v. Bishop*, 289 Minn. 188, 195, 183 N.W.2d 536, 540 (1971). In *Bishop*, identification was an issue contested at trial, but the district court noted that as the trial progressed it clearly appeared to the court that the eyewitnesses' "identification of the defendant throughout the entire sequence of events was based on observation made at the time of the robbery and that it was strong, unequivocal and thoroughly convincing." *Id*. at 195-96, 183 N.W.2d at 541. In affirming the district court's denial of the request to give a jury instruction on eyewitness identification, the supreme court reasoned that the circumstances of the case did not warrant giving the jury the impression that there was some inherent problem with the identification. *Id*. at 194-95, 183 N.W.2d at 540-41. The supreme court also noted that counsel for the defendant was able to test the credibility and reliability of the witnesses' identification testimony and argued the issue at length on summation. *Id*. at 196, 183 N.W.2d at 541.

Here, as in *Bishop*, the circumstances did not warrant the instruction. A.M. testified that she knew appellant and his family her whole life, and that she grew up with his brother and sisters. She also testified that she saw appellant point a black gun with an extended clip at her head and that she later observed the shooter with the exact same type of weapon. Q.W. identified appellant as the shooter after first observing him at the party, and later to police when they showed her appellant's picture. Q.W. also identified

appellant as the shooter in court.  And A.S. testified that appellant admitted to being involved in the shooting.  Finally, the surveillance video from the convenience store showed appellant running from the scene seconds after the shooting.

For all of these reasons, we conclude that the district court did not abuse its discretion by refusing to give the requested instruction.  Even if we were to conclude that the instruction should have been given, any error was harmless because the reliability and credibility of the eyewitnesses' testimony was tested during cross-examination, the identification issue was argued at length during closing arguments, and the district court gave the general instruction on the evaluation of testimony and believability of witnesses. *See State v. Lee*, 683 N.W.2d 309, 316 (Minn. 2004) (stating that appellate courts evaluate the erroneous omission of a jury instruction under a harmless error analysis).

**III.**

Appellant challenges the sufficiency of the evidence to support his conviction of attempted second-degree intentional murder of J.G.  "Whe[n] there is a challenge to the sufficiency of the evidence, this court reviews the evidence in the light most favorable to the verdict to determine if the evidence was sufficient to permit the jury to reach the verdict it did." *State v. Ford*, 539 N.W.2d 214, 225 (Minn. 1995).  We assume that the jury believed the state's witnesses and disbelieved contrary evidence. *State v. Huss*, 506 N.W.2d 290, 292 (Minn. 1993).

Intent to cause the death of a human being is an element of attempted second-degree intentional murder.  Minn. Stat. § 609.19, subd. 1(1) (2012).  Intent "means that the actor either has the purpose to do the thing or cause the result specified or believes

8

that the act, if successful, will cause the result." Minn. Stat. § 609.02, subd. 9(4) (2012); *see State v. Noble*, 669 N.W.2d 915, 919 (Minn. App. 2003) (stating that "[a]n attempt requires that the actor have specific intent to perform acts and attain a result which if accomplished would constitute the crime alleged"), *review denied* (Minn. Dec. 23, 2003).

Appellant argues that the state failed to prove beyond a reasonable doubt that he intended to kill J.G. Because intent is a state-of-mind requirement and not readily observable it is generally proven through circumstantial evidence. *State v. McAllister*, 862 N.W.2d 49, 53 (Minn. 2015). "A conviction based on circumstantial evidence warrants stricter scrutiny." *State v. Smith*, 619 N.W.2d 766, 769 (Minn. App. 2000), *review denied* (Minn. Jan. 16, 2001). In determining whether the evidence is sufficient to sustain a conviction based on circumstantial evidence, we are required to perform a two-step analysis. *State v. Hayes*, 831 N.W.2d 546, 552-53 (Minn. 2013). First, we determine the circumstances proved. *State v. Silvernail*, 831 N.W.2d 594, 598 (Minn. 2013). In doing so, we give due deference to the fact-finder and construe the evidence in the light most favorable to the verdict. *Id.* at 598-99.

Here, the circumstances proved at trial were: (1) A.M. and Q.W. identified appellant as being at the party and getting into a dispute with A.M.; (2) A.M. and Q.W. identified appellant as the shooter; (3) when A.M., Q.W., and J.G. saw the shooter, they all started running away; (4) appellant shot A.M. near her ribcage and the small of her back; (5) appellant also shot Q.W. in the foot, knee, right femur, stomach, chest, wrist, and arm; (6) appellant first shot J.G. in her foot and then her ankle, causing her to fall down; (7) appellant then stood over J.G. and shot her multiple times higher and higher on

9

her left leg; (8) appellant appeared on the surveillance video running from the scene; and (9) soon after the shooting, appellant admitted to his then-girlfriend that he was involved in the shooting.

The second step of the circumstantial-evidence test requires us to determine "whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 599 (quotations omitted). At this second step, we provide no deference to the jury's choice between reasonable inferences. *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn. 2010). "Circumstantial evidence must form a complete chain that, in view of the evidence as a whole, leads so directly to the guilt of the defendant as to exclude beyond a reasonable doubt any reasonable inference other than guilt." *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010) (quotation omitted).

Appellant concedes that the jury determined that the state proved beyond a reasonable doubt that he was the shooter. But appellant argues that because he only shot J.G. in the ankle, foot, and later below the waist, he never possessed the intent to kill her.

Appellant's argument is without merit. Intent to kill may be demonstrated by the firing of a gun at close range when the gun is pointed at the victim. *State v. Bryant*, 281 N.W.2d 712, 714 (Minn. 1979). And in *State v. Johnson*, 322 N.W.2d 220, 223 (Minn. 1982), an intent to kill was established where a defendant fired a shotgun at a police officer in his squad car even though the shot was not sufficiently powerful to penetrate the windshield.

Here, the fact that appellant initially shot J.G. at close range, as he did with A.M. and Q.W., establishes his intent to kill. Whether appellant had poor aim or was shooting indiscriminately does not negate his intent to kill all three. As observed by the district court in denying appellant's motion for a judgment of acquittal, the shooting in this case occurred in two stages: first "there was a fair amount of shooting at all three individuals causing them to run, causing them to get shot badly enough to be on the ground," and second, there was additional direct shooting solely at J.G.'s lower half. Although appellant hit J.G. only in the leg initially, he shot A.M. in the back and Q.W. in the stomach. Because during the initial phase of the shooting appellant opened fire on all three victims and shot two of them in the torso, the circumstances show that the hypothesis that appellant did not intend to kill J.G. is not rational, and there are no other rational hypothesis inconsistent with appellant's guilt. Therefore, the evidence was sufficient for the jury to find appellant guilty of attempted second-degree intentional murder of J.G.

**Affirmed.**